UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

PRIYA TAHILIANI and KIM TSAI,

      Plaintiffs,

      v.

CITY OF EVERETT, MAYOR CARLO
DEMARIA and CITY OF EVERETT
SCHOOL
COMMITTEE,

      Defendants.

Civil Action No.: 1:24-cv-10544

**COMPLAINT AND JURY DEMAND**

**INTRODUCTION**

Everett is a city that has undergone a profound demographic shift since 1990. In the 1990 Census, 91% of respondents in the city identified as not-Hispanic White. Recent Census estimates show that the percentage has fallen to 40%. The overall population demographics of the city are in many ways a lagging indicator, and do not fully capture the scope of this change. Today, according to the Department of Elementary and Secondary Education (DESE), 86.9% of the children enrolled in the Everett Public Schools (EPS) identify as non-White. Despite this massive change, one thing has remained the same, the school administration has been overwhelmingly White and male. For 30 years, Frederick Foresteire served as the Superintendent of EPS until his tenure came to an end after years of sexual harassment, assault and other misconduct involving multiple school department employees, which ultimately resulted in a criminal conviction and sex offender registration. After Forestiere, EPS needed a change and

1

Priya Tahiliani was well suited to serve the city's population in the essential role of providing for the education of Everett's diverse student body. Ms. Tahiliani and Kim Tsai, her Deputy Superintendent, rose to meet the challenges of running this diverse school district, including the need to re-establishing trust between the school administration, its employees, and the community, as well as navigating the COVID-19 pandemic.

However, it was quickly apparent that the entrenched institutional racism and sexism in city government, led by Everett Mayor Carlo DeMaria, was and is still present. The old boys network of patronage works to ensure Everett looks out for its own political class. A cursory examination of city jobs and contracts reveals a tangled web of alliances and family connections benefitting Everett's White and predominantly male leadership.

Mayor DeMaria had relatively little involvement with the School Committee until Ms. Tahiliani and Ms. Tsai, two non-White women, were appointed. Under Foresteire, the most recent district level leadership team had been 100% White but Ms. Tahiliani and Ms. Tsai rocked the boat by hiring a few non-White employees.

Once that started, Mayor DeMaria and the City changed the charter to make him a voting member of the School Committee. Once on the Committee, Mayor DeMaria and his allies did all they could to interfere with Ms. Tahiliani and Ms. Tsai's ability to meaningfully execute their duties and responsibilities. Ms. Tahiliani and Ms. Tsai have been subjected to demeaning and sexist comments, abusive and disparate treatment, and retaliatory attacks, simply for being women of color who refused to maintain a "Whites only" hiring policy for all district level jobs and engaged in protected conduct.

In response, Ms. Tahiliani and Ms. Tsai filed discrimination complaints against Mayor DeMaria, the City of Everett, and the School Committee, detailing the treatment to which they

2

were subjected. As a result of Ms. Tahiliani and Ms. Tsai's opposition to Everett's discriminatory practices, the School Committee fomented a hostile work environment for Ms. Tahiliani and Ms. Tsai. When their initial efforts didn't drive them out, the School Committee increased the pressure, and voted to reject the renewal of Ms. Tahiliani's contract. Anonymous workplace complaints, received through the City's Human Resources (HR) Department, have resulted in Ms. Tahiliani publicly being placed on administrative leave pending an investigation. The investigation has been dragged out over several months preventing Ms. Tahiliani from returning to the workplace before her contract termination date, effectively ending Ms. Tahiliani's tenure with Everett Public Schools, while simultaneously poisoning her candidacy for superintendent positions in other districts. In the meantime, an interim Superintendent has been hired, who was also appointed to formally replace Ms. Tahiliani at the end of her contract. Despite having no professional K-12 experience, her replacement has the qualifications which are apparently required in Everett: he is a man; he is White; and he is from Everett. Thus Ms. Tahiliani's tenure has ended prematurely in an unwarranted cloud of suspicion, and Ms. Tsai, the last remaining person of color in the school administration, has been increasingly marginalized by the new Superintendent. Employees of the Everett Public Schools have been put on notice: if they engage in protected conduct, they too will suffer.

DeMaria and his allies claim Ms. Tahiliani and Ms. Tsai are not "Everett enough," which is simply code for "they're not White like us." Despite the seismic shift in the composition of Everett's residents as reflected by the school age population, the City's old guard continues to desperately cling to power and are making progress by purging District leadership of people of color and installing one of their own as Superintendent. Ms. Tahiliani and Ms. Tsai pursue these claims to send a message, that they will not stand idly by and accept such treatment. Everett's

schools, both the staff and the students for whom they serve as role models, deserve better leadership.

## THE PARTIES

1. Plaintiff Priya Tahiliani ("Ms. Tahiliani") is an individual who resides in Brookline Massachusetts and was the first Superintendent of color in the history of Everett.

2. Plaintiff Kim Tsai ("Ms. Tsai") is an individual who resides in Boston, Massachusetts and is the first Deputy Superintendent of color in the history of Everett.

3. Defendant City of Everett is a duly incorporated municipality of the Commonwealth of Massachusetts, with an address of 484 Broadway, Everett Massachusetts 02149.

4. Defendant Carlo DeMaria ("DeMaria") is the Mayor of Everett, and a member of the City of Everett School Committee, with an address of 484 Broadway, Everett, Massachusetts 02149.

5. Defendant City of Everett School Committee ("School Committee") is the appointing authority for the Superintendent of Schools, with an address of 484 Broadway, Everett, Massachusetts 02149.

## JURISDICTION AND VENUE

6. This Court's jurisdiction is based upon 28 U.S.C. § 1331. In addition, this Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

7. Venue is appropriate under 28 U.S.C. § 1391(b) and (c), as a substantial part of the acts or omissions giving rise to the claims alleged herein occurred within this judicial district, and this Court has personal jurisdiction over all named parties.

8.   Ms. Tahiliani and Ms. Tsai have satisfied all prerequisites and conditions precedent necessary to entitle them to seek remedy against Defendants.

**STATEMENT OF FACTS**

9.   Carlo DeMaria has served as mayor of the City of Everett since 2008.

10.   In December 2019, after a nearly year-long deliberate and transparent search process with robust community input, Ms. Tahiliani was appointed by unanimous vote of the School Committee to serve as Superintendent of the Everett Public Schools.

11.   Ms. Tahiliani identifies as Indian, and as a young student she was an English Language Learner. She is the first person of color to serve as Superintendent of the EPS, a diverse district in which 86.9% of students are students of color.

12.   Throughout her tenure Superintendent Tahiliani has been consistently recognized for her strong performance. For example, she was named President of the Board of Directors of the Massachusetts Association of Teachers of Students of Second Languages. In addition, she was appointed by the Massachusetts Association of School Superintendents ("M.A.S.S.") to the Women's Educational Leadership Network Planning Committee, served as the keynote speaker at the 2022 Women's Educational Leadership Network Conference, served as keynote speaker at City Year's Annual Women's Breakfast, and was asked to serve on a panel alongside DESE Commissioner Riley hosted by Boston University's Wheelock College in March of 2022. The Composite Everett Superintendent Evaluation for 2022 rated her as "Proficient" in all categories. Additionally, she was appointed to be the Urban Superintendents Network representative for the M.A.S.S. Race Equity Diversity and Inclusion Team. In May 2022, Ms. Tahiliani received the President's Award from M.A.S.S.

13. Despite her strong performance, and professional accolades, Ms. Tahiliani has been subjected to unlawful discrimination based upon race, national origin, and gender by members of the School Committee. This unlawful conduct has included, without limitation, being subjected to demeaning, and misogynistic comments and stereotypes by Mayor DeMaria, city staff and members of the School Committee, and being subject to abusive and disparate treatment, and retaliatory attacks.

14. Ms. Tahiliani succeeded Frederick F. Forestiere, a White male who served as Superintendent of EPS for 30 years before retiring abruptly in December of 2018, after being placed on leave for sexual harassment allegations for which he ultimately was convicted criminally.

15. Under Ms. Tahiliani's White predecessor, 100% of the members of the most recent leadership team at the district level were White. During her tenure, that number dropped to 80%, with 20% of the leadership at district level being persons of color. While many would consider this modest progress, Ms. Tahiliani upset Everett's political class by ending the longstanding "Whites only" hiring policy at district level.

16. In her role as Superintendent, Ms. Tahiliani is appointed by the School Committee of the City of Everett ("School Committee"). The School Committee was composed of 9 members prior to January of 2021, when it expanded to 10. At all times relevant hereto, all but one member of the School Committee is White.

17. By way of a Home Rule Petition, the City of Everett changed its City Charter to make the mayor a voting member of the School Committee.

18. The City did not make Mayor DeMaria a voting member of the School Committee until Ms. Tahiliani was appointed Superintendent.

19. The City made this change over the strong objection of the School Committee, during the COVID-19 pandemic, without any public hearings in violation of M.G.L. c. 43B §10(b). Counsel for the School Committee notified the Office of the Attorney General of this violation of law.

20. In February of 2020 Kim Tsai was recruited by Ms. Tahiliani to join her in Everett to serve the students of Everett as Deputy Superintendent, making her one of the only Asian Deputy Superintendents in the Commonwealth of Massachusetts.

21. Despite Ms. Tsai's strong work performance during her tenure as Deputy Superintendent, she has been subjected to unlawful discrimination based upon her race, national origin, and gender, and her affiliation with Ms. Tahiliani in the form of intimidating, hostile, offensive, and retaliatory conduct by Everett School Committee Members Millie Cardello, Joseph Lamonica, Michael McLaughlin, Michael Mangan, Jeanne Cristiano, and Mayor Carlo DeMaria.

22. In or around June of 2020, Ms. Tahiliani established a group of family liaisons to support families in Everett. In light of the fact that 33% of Everett students are English Language Learners, 86.9% of students are students of color, and 73.1% of families speak a first language other than English, Ms. Tahiliani filled these positions with staff of color who spoke the major languages of the district. Ms. Tahiliani also implemented a robust system for real time interpretations so that non-English speaking Everett families could have meaningful access to their children's education.

23. DESE encourages public schools to hire and recruit a diverse and culturally responsive workforce and supports those efforts with several diversification grant programs and resources.

24. Supported by DESE Teacher Diversification grants, and on her own initiative, Ms. Tahiliani hired additional staff that were culturally diverse, including establishing important new positions such as the Family Engagement Manager and the Chief Equity Officer, both of which were filled with non-White candidates.

25. On or about October 5, 2021, School Committee Member Tom Abruzesse, recounted to Ms. Tahiliani that Mayor DeMaria had recently come to his home with 5 large men. Mayor DeMaria proceeded to accost Abruzesse, cursing in front of his grandson, calling Ms. Tahiliani a racist, and saying that she only hires people of color and that they need to get Ms. Tahiliani out.

26. The Boston Globe reported that in his election night victory speech on November 2, 2021, Mayor DeMaria put the city on notice, that there would be punishment for those who opposed him: "There were [people] who worked with us on a daily basis that we considered friends who tried to sandbag us in day before the primary and days before the general election. It hurt us, but in the long run it's going to hurt them, " DeMaria said. "Let me tell you - I raised a lot of money and I'm going to go after a lot of people."

27. Despite their objections to School Committee members interfering in day-to-day operations of the district, members of the School Committee routinely and intentionally sought to undermine and circumvent Ms. Tahiliani and Ms. Tsai.

28. In one particularly troubling instance, School Committee Member Cardello brought a concern that she had heard from a parent regarding EPS sex education curriculum. Ms. Tahiliani encouraged Ms. Cardello to have the family reach out to the Superintendent directly. Instead, on November 24, 2021, School Committee Members Cardello and Lamonica attended a parent-teacher conference without Ms. Tahiliani's permission and in

violation of the Classroom Visitation Policy and made a wildly offensive comment about the staff member's gender identity that resulted in a staff member filing a complaint against one of the School Committee members and necessitating a Title IX investigation.

29. Instead of authorizing the investigation, School Committee members successfully stalled the process by leaving a School Committee meeting on December 6, 2021, early so a quorum would not be present for the executive session to discuss the investigation. The School Committee continued to thwart Superintendent Tahiliani's ability to conduct a Title IX investigation for weeks and undermined her ability to manage the district and ensure a safe environment where staff and students who identify as LGBTQ+IA feel safe and protected.

30. On January 4, 2022, Counsel for the School Committee informed Ms. Tahiliani that the Committee "put the kibosh" on the Title IX investigation.

31. It was not until after a new school committee was seated that an independent investigator was finally contacted on January 6, 2022. In a meeting on January 12, 2022, School Committee Members Cristiano and McLaughlin discouraged Superintendent Tahiliani from signing the engagement letter to initiate the investigation.

32. Due to Superintendent Tahiliani's efforts to initiate the Title IX investigation, Mr. McLaughlin and the members of the School Committee intensified their efforts to drive her out and retaliate against her. On or around January 12, 2022, Ms. Tahiliani met with School Committee Members Jeanne Cristiano and Michael McLaughlin who suggested that that "Roman Numeral V: Superintendent's Report" on the School Committee Agenda be stricken and that Ms. Tahiliani no longer be required to attend School Committee meetings, but rather only be invited to speak on specific topics upon their request. The rationale

offered to Ms. Tahiliani in the meeting on January 12, 2022, was that her Superintendent's Reports "clearly take a lot of work" and she should be relieved of the responsibility to "spend more time with family." This never would have been suggested to her White male predecessor during his tenure.

33. During a discussion of the budget at a January 4, 2021, meeting of the School Committee, regarding approximately $1 million of lease payments and federal reimbursements, Mayor DeMaria spoke over Ms. Tahiliani cutting her off and calling her "confused."

34. In addition to trying to oust Ms. Tahiliani and Ms. Tsai, Mayor DeMaria and members of the School Committee consistently deferred to White males rather than addressing issues with Ms. Tahiliani or the other women of color on the leadership team.

35. For example, Mayor DeMaria frequently requested that the City's Chief Financial Officer, Eric Demas, a White man, be called up at School Committee meetings to comment on school finance, instead of Superintendent Tahiliani, or the School Department's Chief Financial Officer, Ms. Anu Jayanth, another Indian woman. Instead of communicating directly with Ms. Tahiliani or Ms. Jayanth, his staff circumvented them entirely and often ran communications with EPS through the Director of Facilities, another White man.

36. Mayor DeMaria also directly communicated with the Music Director, another White man, to make requests regarding the district rather than communicating such requests through the Superintendent.

37. On or around August 26, 2022, Mayor DeMaria reached out directly to the Director of Special Education, a White male, to request an internship for his daughter, rather than making this request through the Superintendent.

38. These departures from the established practice of having the Superintendent speak on behalf of and communicate with school district employees regarding these topics, among other actions, demonstrate Mayor DeMaria's efforts to undermine her work and show discriminatory animus towards Ms. Tahiliani.

39. Mayor DeMaria also exhibits discriminatory treatment towards Ms. Tahiliani due to her gender and has a history of stereotyping other women in the community, particularly former City Councilor Gerly Adrien, who is also a person of color. His September 2021 review of Superintendent Tahiliani's performance was rife with demeaning  gender stereotyped and biased language. Mayor DeMaria gave Ms. Tahiliani an "Unsatisfactory" rating under the standard of "Engagement" in her performance evaluation.

40. Specifically, he wrote, "A review of the recordings of School Committee meetings will illustrate that her posture, facial expressions, and other physical mannerisms visibly change during discussions and debates of issues. Superintendent Tahiliani's tone, tenor, and demeanor during discussions of different opinions also changes."

41. Referencing her facial expressions and the need to smile in the face of the overt discrimination she has faced, constitutes gender stereotyping, and reflects different expectations that the prior White male Superintendent was never held to. This is not an isolated incident. It was well reported in the media, that at a January 25, 2021, City Council meeting, Mayor DeMaria made similar comments about Councilor Adrien's facial expressions, and implied that he would like to mute her video. Mayor DeMaria also accused her of screaming or pointing her finger in that meeting, however a review of the video of that meeting proves his accusations to be false.

11

42. Mayor DeMaria also makes racially insensitive statements to Everett students. During a panel for students involved in the Everett Police Department Liaison internship program on June 7, 2021, including Ms. Tahiliani, Police Chief Steven Mazzie, and Mayor DeMaria, he proceeded to argue with a student regarding his status as a person of color. Mayor DeMaria stated that if he read all the comments directed towards him that he would "hang himself." A student requested that he refrain from using that phrase, presumably in light of the historical practice of lynching as a form of intimidation and terrorism towards persons of color in the post-Civil War South, as it would be a trigger to others. Mayor DeMaria was unwilling to acknowledge that his word choice may have been offensive to students of color.

43. During the same panel discussion, when Superintendent Tahiliani spoke about challenges she faced as a woman of color in the City of Everett, Mayor DeMaria cut her off from speaking. When she excused herself from the meeting as a result, Mayor DeMaria followed her to the parking lot and berated her, telling her that she knew her comments about facing challenges as a woman of color in Everett were untrue.

44. Mayor DeMaria interfered with critical school services and undermined enrichment programming, by creating analogous programs run by the city, to avoid giving additional funding to the district.

45. Since the first year of Superintendent Tahiliani's tenure, Mayor DeMaria has not provided funding above net school spending in his proposed annual operating budget, instead only providing the legal minimum. Everett received a warning letter from the DESE Associate Commissioner of District and School Financing for not meeting the net school spending requirement in Fiscal Year 2021 and reminding them of their legal obligation to do so.

12

46. By contrast, in the five years preceding Ms. Tahiliani's appointment, the city provided $550,000 to $5.5 million above net school spending to her White male predecessor.

47. Mayor DeMaria also refused to appropriate the school's Medicaid funds directly back to the schools during Ms. Tahiliani's Superintendency, despite numerous requests for those funds. Mayor DeMaria's racist conduct did more than undermine district leadership, it harmed the students by withholding millions of dollars from the district.

48. This hostile and disparate treatment toward Superintendent Tahiliani and Deputy Superintendent Tsai was not only perpetrated by Mayor DeMaria, but also by Members of the School Committee as well.

49. School Committee Member Jason Marcus was widely quoted in the media in 2013, then a City Councilor, describing the "well-to-do" families of Asian college students, that he hoped would frequent the Everett casino, saying "[t]hey're paying cash. And they are very big gamblers."

50. School Committee Member Michael McLaughlin is often abusive and demeaning, talks over and interrupts her or refuses to allow her to speak. For example, at the May 27, 2021, the City Council meeting, then-City Councilor McLaughlin invited two of Ms. Tahiliani's White male subordinates, Steve Bond, and Charlie Obremski, to speak instead of her and refused to invite her to speak even when probed by other Council members.

51. Then School Committee Member-elect McLaughlin's racial animus was further exhibited by his November 2021 Public Records Request for the interview notes and hiring process for the Family Liaisons, Community Engagement Manager, and Chief of Equity, all of whom are persons of color. No such requests were made by Mr. McLaughlin for any White

hires. Mr. McLaughlin's higher level of scrutiny towards persons of color reveals his discriminatory animus.

52. At the January 18, 2022, School Committee agenda included two items presented by Mr. McLaughlin, a 90-day hiring freeze for all non-classroom related positions, a move directed to suppress the cessation of the "Whites only" hiring policy, and a 90-day salary freeze for all non-union/ non-contracted personnel. The salary freeze would have only impacted Ms. Tahiliani and Ms. Tsai.

53. Additionally, Mr. McLaughlin sought to introduce a measure that would have required the Superintendent to seek prior approval from the School Committee, before approving any contract extension for any non-union/non-contractual employee. This measure would have grossly undermined Ms. Tahiliani's authority, and it would have impaired her ability to extend Deputy Superintendent Tsai's contract, but it was not approved.

54. None of the above referenced discriminatory or retaliatory measures of this kind were ever introduced by the School Committee to silence or minimize the role of her White male predecessor.

55. On January 17, 2022, Ms. Tahiliani filed a Charge of Discrimination at the MCAD and EEOC detailing the above stated facts.

56. Increasingly concerned for their safety, on January 21, 2022, Ms. Tahiliani and Ms. Tsai paid to have a security company to sweep their workspaces for surveillance devices. The sweep turned up two surveillance cameras installed in Ms. Tahiliani's office.

57. The cameras were removed and subsequently investigated by the FBI which, upon information and belief, has not concluded its investigation or issued any public statements regarding the outcome of the investigation.

14

58. To intimidate and silence Ms. Tahiliani and Ms. Tsai from raising concerns about the surveillance cameras, Mayor DeMaria exclaimed in a heated manner during a June 21, 2022, School Committee meeting, that the FBI purportedly had informed him that the cameras had been installed for quite some time. To date, Ms. Tahiliani and Ms. Tsai have not been informed by the FBI about the investigation's outcome.

59. At the February 3, 2022, meeting of the School Committee's Rules Subcommittee, in an attempt to undermine Ms. Tahiliani, an amendment was proposed by School Committee Member McLaughlin to strip the Superintendent of the role of Secretary of the School Committee. It was suggested during this meeting that this change would allow her to spend more time with her family.

60. At the same meeting, School Committee Member McLaughlin publicly volunteered that the Deputy Superintendent could fill in. Notwithstanding the fact that Ms. Tsai also has a family, she was not asked for her assent or opinions, putting her on the spot and exerting pressure for her to accept what would be a major shift in district responsibilities.

61. Around the same time, Deputy Superintendent Tsai was tasked with responding to Public Records Requests (PRRs) which had been processed by Mr. Obremski, a White male. Previously, School Committee Member McLaughlin would send PRRs directly to Mr. Obremski. After Ms. Tsai took on this responsibility, School Committee Member McLaughlin stopped sending PRRs directly to the EPS, instead filtering them through the City Solicitor.

62. On February 18, 2022, American Alarm sent EPS an activity log, showing that the alarm panel for the main school administration building had not been working since November of 2020. The company informed Deputy Superintendent Tsai that they had reached out several

times to Steve Bond, a direct report of Mr. Obremski, but nothing was ever done to remedy the issue, endangering staff, and students.

63. In a meeting with School Committee Member Cristiano on March 3, 2022, she admitted to Superintendent Tahiliani that she had been elected to the school committee to "get rid" of her.

64. On March 16, 2022, in a meeting with School Committee Member Cristiano, she admitted to Superintendent Tahiliani that an operational audit was put on the School Committee agenda in an effort to catch Ms. Tahiliani doing something wrong.

65. In an effort to undermine Superintendent Tahiliani's authority, School Committee Members Cardello and LaMonica placed an item on the March 21, 2022, School Committee agenda to discuss the renewal of Assistant Superintendent Charles Obremski's contract, which is in direct conflict with the process set forth in M.G.L. c. 71, § 59. Once the position is established and the initial appointment is made, the School Committee has no role in the approval of a renewal. The matter of Mr. Obremski's renewal was subject to Ms. Tahiliani's sole discretion as Superintendent.

66. Prior to the School Committee meeting on March 21, 2022, Ms. Tahiliani forwarded an email drafted by Ms. Tsai, which raised several concerns regarding the motion to Counsel for the School Committee and Committee Member Cristiano. Nevertheless, the Committee voted 7-1 to refer Mr. Obremski's contract to the Finance and Negotiations Subcommittee. Not only did they fail to follow the law, but this vote served to undermine the authority of the Superintendent to manage the district.

67. During a May 16, 2022 School Committee Meeting, in an attempt to embarrass and undermine Superintendent Tahiliani, Mayor DeMaria called up her White Male subordinate

Mr. Obremski, to ask him in open session if the financial stewardship of the school department is the job of the CFO or the Business Manager, an attempt to refute a statement by Ms. Tahiliani from earlier in the meeting that she is the financial steward of the district. Mr. Obremski responded that both the Superintendent and the CFO are on record at the Department of Elementary and Secondary Education as signers for all School Department financials.

68. On June 6, 2022, Superintendent Tahiliani sent an email to School Committee Members McLaughlin and Cristiano, asking them to curtail the practice of calling on White male subordinates to speak on agenda items introduced by the Superintendent, noting that she finds the treatment disparate and motivated by discrimination. As part of the same correspondence, she forwarded an email from Anu Jayanth which describes recent "discriminatory, degrading, intimidating, reatalitory [sic] treatment" she received from the City CFO, and also notes that Mr. Obremski is treated much more favorably by the School Committee. She further observes that Mr. Obremski has markedly more favorable terms in his contract, and that Mayor DeMaria "continually asks for the opinion of Charles Obremski, Eric Demas, and Robert Moreschi, all of whom are white males."

69. At the June 6, 2022, School Committee meeting, a White male was nevertheless invited to answer questions that had already been answered by a non-White female, and Superintendent Tahiliani felt compelled to point out this disparate treatment. Ms. Tahiliani highlighted that the Committee "…continue[s] to defer to people, who are not the people that we have in that role… it happened at the very last meeting, when I was actually completely dismissed…others were invited up to say what I had just said… I find it to be incredibly dismissive... I actually wrote an email today asking for this kind of behavior…

17

to be curtailed because I find them to be incredibly disrespectful. If you do not believe me to be qualified to answer these questions or our CFO to be qualified to answer these questions, I think you have a larger issue that we need to come out and then discuss."

70. A meeting of the Financial and Negotiations Subcommittee scheduled for June 7, 2022, had to be postponed because a quorum of School Committee members would not be present. This had disruptive and cascading negative effects and required meetings with four bargaining units to be postponed, because the administration did not have authorization from the Subcommittee on its proposals, further undercutting Superintendent Tahiliani and Deputy Superintendent Tsai's ability to run the district.

71. An email sent by Ms. Tahiliani to the Committee regarding the consequences of the missed June 7, 2022, meeting, was met with a flippant and demeaning response from School Committee Member Cardello.

72. On June 17, 2002, Jeanne Cristiano called Deputy Superintendent Tsai and said that she may be able to secure votes for Ms. Tahiliani's contract extension if she agreed to renew Mr. Obremski's contract.

73. At the June 21, 2022, School Committee meeting, the committee voted 5-4 to refer Superintendent Tahiliani's contract back to the sponsor, essentially refusing to engage in discussion despite Ms. Tahiliani's proficient evaluation and recent professional accolades.

74. On June 29, 2022, Counsel for the School Committee informed Superintendent Tahiliani that certain School Committee members would vote to extend her contract if she extended Mr. Obremski's contract.

75. On July 8, 2022, School Committee Member Cristiano and Counsel for the School Committee told Ms. Tahiliani that School Committee Member McLaughlin would consider

extending her contract if she apologized for calling him out regarding the lack of quorum at the June 7, 222 Finance and Negotiations Subcommittee meeting.

76. At the July 18, 2022, School Committee meeting, School Committee Member McLaughlin left abruptly without offering justification, immediately prior to a vote to approve bills and payrolls. This resulted in the city placing a hold on the School Departments outgoing checks, which delayed outgoing payments, embarrassing the school administration, and diminishing its standing in the community.

77. On August 8, 2022, Superintendent Tahiliani met with School Committee Member Mangan who told her that he ran for School Committee to get rid of her.

78. On or around August 15, 2022, a member of the School Committee Member Jason Marcus called a principal to ask questions about a recently filed grievance and communicated directly with a union employee regarding the same matter. This interference served to undermine and circumvent Ms. Tahiliani and Ms. Tsai.

79. At a meeting on August 24, 2022, with School Committee Member Cristiano she admitted to Superintendent Tahiliani that there was a plan to terminate her and replace her with Mr. Obremski.

80. After a presentation by Deputy Superintendent Tsai to a joint meeting of the City Council & School Committee on October 4, 2022, School Committee Member McLaughlin ripped up Ms. Tsai's proposal in her plain view, in the open session in the presence of her supervisor, the School Committee, the City Council, and the viewing public, an act clearly designed to humiliate and embarrass Ms. Tsai.

81. On October 5, 2022, Superintendent Tahiliani emailed Cathy Draine, Director of Diversity Equity and Inclusion, copying the City Solicitor to request an investigation into the City

Hall Finance Department after a city Finance Department employee emailed a demeaning and abusive comment to an EPS financial analyst disparaging EPS Chief Financial Officer Anu Jayanth.

82. Deputy Superintendent Tsai filed a Charge of Discrimination with Massachusetts Commission Against Discrimination (MCAD) and the Equal Employment Opportunity Commission (EEOC) against Mayor DeMaria, the School Committee, and the City on November 18, 2022.

83. On or around November 20, 2022, Superintendent Tahiliani received information that School Committee Member Lamonica's wife reached out directly to a school principal to exert influence in the hiring of their son, who was hired by EPS. This occurred despite an August 26, 2022, email from the School Committee Chair which included an express directive to members to not to contact school leaders regarding hiring, as it "undermines the superintendent and puts staff members in an uncomfortable position."

84. On December 12, 2022, Superintendent Tahiliani received her evaluation, which despite a "Proficient" rating in the composite evaluation, nevertheless had many biased and unevidenced comments.

85. At a December 12, 2022, City Council meeting, Mayor DeMaria was given nearly 40 minutes to discuss the status of Pope John High School and other subjects but when it was Superintendent Tahiliani's turn to speak, Mayor DeMaria yelled over her, and the City Council had to go into recess. Only after Ms. Tahiliani called out this disparate treatment to a Council Member during the recess was she permitted to speak, after Mayor DeMaria had left the meeting.

20

86. At a December 19, 2022, School Committee meeting, Superintendent Tahiliani felt compelled to respond to the biased evaluation she received from School Committee Member McLaughlin with a presentation and written correspondence. The next day, Ms. Tahiliani emailed Counsel for the School Committee, and Chair Cristiano to follow-up regarding the pattern of bias that had emerged but received no response.

87. On January 20, 2023, Superintendent Tahiliani met with School Committee Member Cardello, during which she commented on Ms. Tahiliani's facial expressions, and asked whether she was going to receive an additional MCAD complaint as a result of her comments, belittling Ms. Tahiliani and minimizing the disparate treatment she was being subjected to by Mayor DeMaria and the School Committee. Ms. Cardello later emailed an apology for things said during this meeting.

88. On February 1, 2023, the Finance and Negotiations Subcommittee was scheduled to meet to discuss Superintendent Tahiliani's contract, but they were unable to get a quorum of Members. Ms. Tahiliani reports that Committee Member Mangan told her that Committee Member McLaughlin was refusing to go or wanted to hear from Counsel first.

89. On February 22, 2023, Ms. Tahiliani and Ms. Tsai met with School Committee Member Christiano, who reported that School Committee Member Marcus said he couldn't vote for Ms. Tahiliani's contract or Mayor DeMaria would "kill me."

90. On February 24, 2023, Deputy Superintendent Tsai informed counsel for the School Committee that she and Ms. Tahiliani were scheduled to meet on March 8, 2023, with counsel from the Department of Justice to discuss their discrimination and retaliation complaints.

91. In response to Ms. Tahiliani and Ms. Tsai's protected conduct, specifically the filing of the MCAD complaints, and their cooperation in the Department of Justice investigation, and based on the discriminatory animus described above, on March 6, 2023, the School Committee, by a vote of 4-6, refused to renew Superintendent Tahiliani's employment contract.

92. Among the pretextual reasons cited for the School Committee's vote were school safety and security issues and school cleanliness issues.

93. During that same School Committee meeting the Committee heard an update from EPS Director of Security, who is a White female. Mayor DeMaria said he was "impressed" by EPS security efforts. School Committee Members McLaughlin, Sarni and Cardello joined in praising the Director's work.

94. Assistant Superintendent Charles Obremski, a White male, was responsible for school cleanliness. Tellingly, the School Committee fought to undermine Ms. Tahiliani's authority as Superintendent to renew Mr. Obremski's contract, yet the School Committee expressly cited issues for which Mr. Obremski was responsible in voting not to renew Superintendent Tahiliani's contract.

95. On March 9, 2023, Ms. Tahiliani and Ms. Tsai filed a new Charge of Discrimination with the EEOC.

96. On June 5, 2023, the School Committee voted 6-3 to commence the search for a new Superintendent. In August and September of 2022, the School Committee urgently plowed ahead with a superintendent search, failing to follow the legal process to engage a search firm and recruit candidates. The opaque process did not include meaningful community input, in stark contrast with the 2019 superintendent search.

97. A June 9, 2023, billing entry from Attorney Janet Barringer, special counsel for the School Committee, shows that the School Committee sought advice as to whether it could put Ms. Tahiliani on Administrative Leave.

98. On October 18, 2023, Mr. William Hart obtained an "Emergency" Superintendent License from the Department of Elementary and Secondary Education.

99. On October 26, 2023, Superintendent Tahiliani and Deputy Superintendent Tsai received written notice requesting that they attend a special meeting of the School Committee to discuss allegations made by EPS employees and brought to the City of Everett's HR Department.

100. At the October 30, 2023, School Committee meeting, the Committee voted in an open session to engage an outside investigator to investigate 10 workplace accusations against the School's Administration, which apparently alleged claims of retaliation, hostile work environment, favoritism, bullying, intimidation, age discrimination, ethical violations, unprofessional behavior, and an allegation that the EPS HR Department was not investigating workplace complaints.

101. The complaints were received by the City of Everett's HR Department rather than by the EPS HR Department, which is outside of the process set forth in the EPS Employee Handbook and collective bargaining. The City's HR Director is appointed by Mayor DeMaria. A heavily redacted memorandum summarizing the complaints, which was generated by the City's HR Department, was relied upon as the basis of the School Committee's action.

102. None of the complaints were provided to Ms. Tahiliani or Ms. Tsai before, during or after the October 30, 2023, meeting.

23

103. Recklessly announcing such inflammatory accusations against Superintendent Tahiliani and Deputy Superintendent Tsai, in an open session, prior to any fact finding, without any opportunity to respond or defend themselves, has greatly harmed their professional reputations and standing in the educational community. At the Committee's October 30th meeting, School Committee Member Jeanne Cristiano expressed great concern over discussing these allegations in an open session and described it as "…a real black mark on their reputation for the rest of their life." She further observed that "...the terrorists that bombed the twin towers...they have been afforded more rights, more basic civil rights..."

104. The charges leveled involve allegations that are much more serious than mere complaints about Ms. Tahiliani's or Ms. Tsai's performance or professional competence, and impute their character, reputation, and integrity. Ms. Tahiliani and Ms. Tsai both categorically deny any wrongdoing. The School Committee intentionally publicized these allegations, by choosing to discuss the allegations in an open session, rather than convening in executive session, causing great harm to Ms. Tahiliani and Ms. Tsai.

105. When School Committee Member Marcony Barros asked who the Interim Superintendent would be, School Committee Member Mangan blurted out Ms. Tsai's name unilaterally and without a vote from the Committee. After Deputy Superintendent Tsai's name was mentioned, School Committee Member Millie Cardello commented, "I thought we were placing her [Ms. Tsai] on leave too." When Cardello was later confronted about this statement by Paula Sterite, a member of the community, they had an email exchange documenting that Cardello did in fact make this statement.

106. A motion was made and approved by a 7-3 vote to place Superintendent Tahiliani on paid administrative leave pending the outcome of the investigation.

24

107.  The School Committee voted to retain an outside consultant to investigate the complaints.

108.  Cardello's statement, combined with Hart's emergency licensure application, suggests that the School Committee had predetermined to place both Deputy Superintendent Tsai and Superintendent Tahiliani on leave.

109.  Upon information and belief, the numerous allegations against Ms. Tahiliani's White male predecessor, some of which resulted in sustained ethical violations and criminal convictions, were announced, and handled in a much more discrete manner by the School Committee.

110.  On October 31, 2023, an all-staff email was sent out by School Committee Chair Michael Mangan, announcing that Deputy Superintendent Tsai would serve as Acting Superintendent. Only after this all-staff email was sent did Ms. Tsai actually confirm her willingness to serve to the School Committee Chair and the Counsel for EPS Robert Galvin.

111.  The fact that the School Committee was willing to let Ms. Tsai continue in the Acting Superintendent role when they had placed Ms. Tahiliani on leave pending an investigation, ostensibly based on the same allegations, shows that there was no legitimate business reason for the School Committee's decision to place Ms. Tahiliani on leave. Rather, the reasoning was pretextual to mask the Committee's true intentions to retaliate against Ms. Tahiliani and pressure her to resign her position.

112.  On November 1, 2023, in an email to the School Committee Chair and Attorney Galvin, Ms. Tsai asked to be considered for the position of Acting/Interim Superintendent to be voted on at the November 2, 2023, meeting.

25

113. On November 2, 2023, the School Committee voted 8-1 to appoint Mr. William Hart, a White man and lifelong resident of the City of Everett, with no professional experience in K-12 education, to be the Interim Superintendent of Schools. Despite Deputy Superintendent Tsai's willingness and interest in serving in the position, she was passed over in favor of Mr. Hart.

114. The School Committee has agreed to compensate Mr. Hart at a starting salary that is $10,000 greater than the salary Ms. Tahiliani was paid in her fourth year as Superintendent and agreed to include various advantageous clauses in Hart's employment agreement that were not given to Ms. Tahiliani.

115. On November 15, 2023, Ms. Anu Jayanth, a South Asian female who serves as the Assistant Superintendent for Finance resigned her position, citing "blatant racism, nepotism and cronyism" among the reasons given for her departure. Ms. Tahiliani was on administrative leave when Ms. Jayanth resigned, however, upon information and belief the district has failed to investigate these allegations, demonstrating the Defendants' continued callousness towards persons of color who have struggled against disparate treatment within the school district by the Defendants.

116. Starting December 6, 2023, Deputy Superintendent Tsai took a medical leave of absence to receive needed treatment due to the severe emotional distress caused by the discriminatory and retaliatory conduct of the Defendants against her.

117. On December 20, 2023, the School Committee voted unanimously to appoint Mr. Hart as the Superintendent of the Everett Public Schools.

118. On January 29, 2024, School Committee Member McLaughlin took to social media to admonish members of the School Committee for "...attempting to silence the victims of

Superintendent Tahiliani and her pathetic administration..." recklessly furthering the reputational harm of Ms. Tahiliani and Ms. Tsai.

119. Superintendent Tahiliani's contract expired on February 29, 2024. She is now seeking new employment, with the "black mark" of these allegations hanging over her candidacy.

120. Educational recruitment and hiring platform TalentEd, a software product used by many school districts in Massachusetts and presumably many others, asks applicants "Have you ever been placed on leave by your employer for alleged misconduct?" Regardless of the outcome of the investigation, Ms. Tahiliani is now forced to answer this and similar questions in the affirmative for the rest of her career.

121. There was no legitimate basis to publicly place Ms. Tahiliani on administrative leave, other than to publicly embarrass her to try to force her resignation in retaliation for her opposition to the Defendants' discriminatory conduct.

122. Where Deputy Superintendent Tsai was not initially placed on administrative leave in response to the complaints and has never seen or been informed of what the complaints against the school administration entail, she is living in a state of emotional distress wondering whether she will be subjected to the same or similar baseless allegations in the investigation that Ms. Tahiliani has been when Ms. Tsai is medically able to return to work.

123. During the publicly announced and still pending investigation, Ms. Tahiliani has been a finalist candidate for superintendent positions in two other communities but has been passed over for both positions because of the damage to Ms. Tahiliani's reputation created by the Committee's actions against her.

124. Ms. Tahiliani's listed references in her applications also reported that they were asked questions about the pending investigation in due diligence checks made as part of the applications process in both communities.

125. Parents in one of the communities in a public discussion of the superintendent search raised the cloud of suspicion from the pending investigation as a mark against her candidacy there as well.

126. The investigation into the complaints against Ms. Tahiliani and Ms. Tsai has taken an unreasonably long time, increasing their distress and uncertainty about their future. At this point it seems clear that the School Committee never intended the investigation to finish before Ms. Tahiliani's contract term expired.

## CLAIMS FOR RELIEF

### COUNT I

### Race/National Origin Discrimination – Title VII and G.L. c.151B

### (All Defendants)

127. Ms. Tahiliani and Ms. Tsai hereby restate and incorporate here the above paragraphs as if each were set out in its entirety.

128. Ms. Tahiliani and Ms. Tsai have suffered adverse actions and/or disparate treatment due to their race/national origins.

129. As a consequence of the Defendants' actions, the Plaintiffs suffered and continue to suffer damages in an amount to be determined at trial, including but not limited to loss of income, loss of employment benefits, other financial losses, loss of professional opportunities, loss of personal and professional reputation, loss of community standing, and emotional distress.

**COUNT II**

**Gender Discrimination – Title VII and G.L. c.151B**

**(All Defendants)**

130. Ms. Tahiliani and Ms. Tsai hereby restate and incorporate here the above paragraphs as if each were set out in its entirety.

131. Defendants have discriminated against Ms. Tahiliani and Ms. Tsai have suffered adverse action and/or disparate treatment due to their gender.

132. As a consequence of the Defendants' actions, the Plaintiffs suffered and continue to suffer damages in an amount to be determined at trial, including but not limited to loss of income, loss of employment benefits, other financial losses, loss of professional opportunities, loss of personal and professional reputation, loss of community standing, and emotional distress.

**COUNT III**

**Retaliation – Title VII and G.L. c.151B**

**(All Defendants)**

133. Ms. Tahiliani and Ms. Tsai hereby restate and incorporate here the above paragraphs as if each were set out in its entirety.

134. Ms. Tahiliani and Ms. Tsai engaged in protected oppositional activity.

135. Ms. Tahiliani and Ms. Tsai each suffered adverse actions as a result.

136. Ms. Tahiliani and Ms. Tsai have been subjected to actions which cause a chilling effect preventing others from engaging in protected activity.

137. As a consequence of the Defendants' actions, the Plaintiffs suffered and continue to suffer damages in an amount to be determined at trial, including but not limited to loss of income, loss of employment benefits, other financial losses, loss of professional opportunities, loss of personal and professional reputation, loss of community standing, and emotional distress.

## COUNT IV

### Aiding and Abetting – Title VII and G.L. c.151B

**(All Defendants)**

138. Ms. Tahiliani and Ms. Tsai hereby restate and incorporate here the above paragraphs as if each were set out in its entirety.

139. Defendants aided and abetted each other in discriminatory/retaliatory acts against Plaintiffs.

140. As a consequence of the Defendants' actions, the Plaintiffs suffered and continue to suffer damages in an amount to be determined at trial, including but not limited to loss of income, loss of employment benefits, other financial losses, loss of professional opportunities, loss of personal and professional reputation, loss of community standing, and emotional distress.

## COUNT V

### Interference with Protected Rights – Title VII and G.L. c.151B

**(All Defendants)**

141. Ms. Tahiliani and Ms. Tsai hereby restate and incorporate here the above paragraphs as if each were set out in its entirety.

142. Defendants interfered with Plaintiffs' exercise of protected rights under c.151B.

143. As a consequence of the Defendants' actions, Plaintiffs suffered and continue to suffer damages in an amount to be determined at trial, including but not limited to loss of income, loss of employment benefits, other financial losses, loss of professional opportunities, loss of personal and professional reputation, loss of community standing, and emotional distress.

## COUNT VI

### Hostile Work Environment – Title VII and G.L. c.151B

### (All Defendants)

144. Ms. Tahiliani and Ms. Tsai hereby restate and incorporate here the above paragraphs as if each were set out in its entirety.

145. Defendants have caused a hostile work environment for both Plaintiffs based on their gender, race, and national origin.

146. As a consequence of the Defendants' actions, the Plaintiffs suffered and continue to suffer damages in an amount to be determined at trial, including but not limited to loss of income, loss of employment benefits, other financial losses, loss of professional opportunities, loss of personal and professional reputation, loss of community standing, and emotional distress.

## COUNT VII

### Substantive and Procedural Due Process – 42 U.S.C. § 1983 and the Fourteenth Amendment to the Constitution of the United States

### (All Defendants)

31

147. Ms. Tahiliani and Ms. Tsai hereby restate and incorporate here the above paragraphs as if each were set out in its entirety.

148. Defendants have deprived Ms. Tahiliani and Ms. Tsai of their liberty interests without due process.

149. As a consequence of the Defendants' actions, the Plaintiffs suffered and continue to suffer damages in an amount to be determined at trial, including but not limited to loss of income, loss of employment benefits, other financial losses, loss of professional opportunities, loss of personal and professional reputation, loss of community standing, and emotional distress.

## COUNT VIII

### Equal Pay – 29 U.S.C. § 206 and G.L. c. 149, § 105A

### (All Defendants)

150. Ms. Tahiliani hereby restates and incorporates here the above paragraphs as if each were set out in its entirety.

151. Defendants have violated the provisions of 29 U.S.C. § 206 and G.L. c. 149, § 105A by paying Ms. Tahiliani less than the wages paid to an employee of a different gender for comparable work.

152. As a consequence of the Defendants' actions, Ms. Tahiliani is entitled to recover unpaid wages, liquidated damages, the costs of the action and reasonable attorneys' fees.

## JURY TRIAL CLAIM

Plaintiffs respectfully demand a jury trial on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

- Award damages to be determined at trial;

- Order Defendants to cease and desist their unlawful conduct;

- Award attorneys' fees; and

- Award any other such relief as the Court deems proper.

<div style="margin-left: 45%;">

The Plaintiffs,
Priya Tahiliani and Kim Tsai,
By their counsel,
/s/ Christopher L. Brown

_____
Christopher L. Brown (BBO# 663176)
Ivria Glass Fried (BBO#688177)
Andrew N. Bettinelli (BBO# 703220)
Harrington Heep LLP
40 Grove Street, Suite 190
Wellesley, MA 02482
(617) 489-1600
cbrown@harringtonheep.com
ifried@harringtonheep.com
abettinelli@harringtonheep.com

</div>

Dated: March 4, 2024